WENDELYN D. GOODRICH,

                **Plaintiff,**

-vs-                               **Case No. 6:10-cv-1818-Orl-28DAB**

COMMISSIONER OF SOCIAL
SECURITY,

                **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and **REMANDED**.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits on September 16, 2002. R. 53, 126-28, 735-37. She alleged an onset of disability on February 24, 1999, following an accident when

she fell out of a golf cart and was dragged 50 feet, injuring her left arm and lower back. R. 32-36, 502, 780. (Tr. 53, 126-128, 735-737). Her application was denied initially and upon reconsideration. R. 65-68. Plaintiff requested a hearing, and two hearings were held before an Administrative Law Judge who found on July 30, 2007 that Plaintiff was not disabled. R. 53-64. Plaintiff filed an appeal in this Court on June 16, 2008, and the Commissioner's decision was reversed and remanded under sentence four of 42 U.S.C. § 405(g) for the Administrative Law Judge to reconsider Dr. Miles' opinion, update treatment records, obtain a consultative examination by a cardiologist if necessary, and determine the onset date of Plaintiff's dysautonomic syndrome. R. 840, 842-60; *see Goodrich v. Commissioner of Soc. Sec.,* Case No. 6:08-cv-973-Orl-28DAB.

A second Administrative Law Judge, Patrick F. McLaughlin (hereinafter "the ALJ"), held a new hearing on June 17, 2010 (R. 937-1019) and issued a new decision on August 19, 2010 finding Plaintiff not disabled. R. 824-39. This *second* appeal followed with the filing of a Complaint for judicial review in this Court on December 6, 2010. Doc. 1.

### B.    Medical History and Findings Summary

Plaintiff was born on January 20, 1973, and was 26 years old on her alleged onset date of February 24, 1999. R. 126, 134, 144, 776. She completed the twelfth grade and some college courses but never received a degree. R. 538, 776. Her past relevant work included positions as an office manager, a department secretary and receptionist, and a receptionist in medical offices from 1994 until 1999 and as a dispatcher at a police department from 1991 until 1993. R. 145, 163-70, 199-206, 236. Plaintiff attempted to return to work from October through December 2000 in an office job, but the County physician would not release her for work with the County. R. 154, 210, 496. Plaintiff noted on SSA forms that she was terminated in May 1999 from her office manager position at Florida

Hospital when she could not return from short term disability[1] because of a doctor's restrictions. R. 199, 210.

Plaintiff's medical history is set forth in the ALJ's decision. In summary, Plaintiff complained of supraventricular tachycardia, neuro-cardio syncopy and mitral valve prolapse, severe headaches, stomach problems, asthma, somatoform disorder, depression, allergies, back, neck, arm pain, extreme fatigue and weakness, and blurry vision. R. 68, 144, 207, 217. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from degenerative disc disease of the cervical and lumbar spine, central disc protrusion at L5-S1, asthma, dysautonomic syndrome, somatoform disorder and depression, which were "severe" medically determinable impairments, but were not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 829-30.

The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform less than sedentary work, as she could lift ten pounds occasionally and five pounds frequently, and she could push or pull objects weighing up to 10 pounds. R. 831. She also had postural limitations that allowed her to only occasionally perform tasks that require balancing, and she was unable to perform tasks that require stooping, kneeling, crouching and crawling. Due to the Plaintiff's limitations, she also had to be allowed to alternate between periods of sitting and standing at will. R. 831. Due to her manipulative limitations, Plaintiff was only occasionally able to perform tasks that required gross manipulation with either hand, and she had environmental limitations. Plaintiff was further limited to low-stress positions involving simple, routine, repetitive tasks that required only occasional interaction with the public. R. 831.

_____

[1]Based on explanation in other records, it appears that Plaintiff was pregnant and entitled to maternity leave around the same time. It is not clear whether the short term disability was actually maternity leave or due to her injuries from the golf cart accident.

In determining Plaintiff's RFC, the ALJ relied on the testimony of a non-examining medical expert and mental health expert (R. 832-35), and found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the ALJ's assigned residual functional capacity assessment. R. 835-36. Based upon Plaintiff's RFC, the ALJ determined that she could not perform past relevant work. R. 837. Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the vocational expert ("VE"), taking into consideration Plaintiff's non-exertional impairments, the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as a call out operator, cutter/paster for press clippings, and a document preparer. R. 838-39. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. R. 839.

Plaintiff now asserts five main points of error. First, she argues that the ALJ erred by failing to state what weight, if any, was accorded to the opinion of the treating physician, Dr. Shea. Second, she claims the ALJ erred by failing to state what weight was accorded to the letter written by her daughter. Third, Plaintiff contends the ALJ erred by rejecting the opinion of Plaintiff's treating physician, Dr. Miles, without good cause. Fourth, she asserts that the ALJ erred by failing to pose a complete hypothetical question to the vocational expert and by relying on the vocational expert testimony that conflicted with the Dictionary of Occupational Titles. Five, Plaintiff argues that the ALJ's failure to consider the side effects of her medications was not based on correct legal standards. All points are addressed, though not in the order asserted by Plaintiff. For the reasons that follow, it

is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and **REMANDED**.

## II.     STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted); *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 29 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments

which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

## III. ISSUES and ANALYSIS

### A.      Treating physician's opinions

Plaintiff contends that the ALJ erred by failing to state what weight, if any, was accorded to the opinion of one of the treating physician, James K. Shea, M.D. (R. 62), Plaintiff's treating pain management physician, and by rejecting the opinion of another of Plaintiff's treating physician, Dr. Miles, without good cause. (R. 493). The Commissioner argues that the ALJ gave Dr. Shea's and Dr. Miles' opinions the appropriate weight.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callaghan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See*

*Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

*1. Dr. Shea's opinion*

Plaintiff argues that the ALJ erred in failing to state what weight, if any, was given to the opinion of Dr. Shea who opined in May 2006 that Plaintiff was unable to sit for six hours in an eight hour work day, even if she was able to periodically alternate sitting and standing. R. 234; R. 824-39. The Commissioner concedes that the ALJ failed to properly articulate the weight given to Dr. Shea's opinion, but responds that any error in articulating the weight accorded to Dr. Shea's opinion is, at worst, harmless.

Plaintiff relies on the recent Eleventh Circuit decision in *Winschel v. Commissioner of Social Security*, in which the Eleventh Circuit reversed and remanded the case because the ALJ failed to mention the treating physician's medical opinion, and therefore did not give it the appropriate weight.

*See Winschel v. Commissioner of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  In *Winschel*, the Eleventh Circuit clarified the standard the Commissioner is required to utilize when considering medical opinion evidence.  The Eleventh Circuit held that whenever a physician offers a statement reflecting judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis, and prognosis, what the claimant can still do despite his or her impairments, and the claimant's physical and mental restrictions, the statement is an opinion requiring the ALJ to state with particularity the weight given to it and the reasons therefor. *Id.* (citing 20 CRF §§ 404.1527(a)(2), 416.927(a)(2); *Sharfarz v. Bowen*, *supra*.  The Eleventh Circuit stated that " '[i]n the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.' " *Winschel*, 631 F.3d at 1178–79 (quoting *Cowart v. Schwieker*, 662 F.2d 731, 735 (11th Cir.1981)).

> As noted In *Winschel*:
>
> "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).
>
> * * *
>
> The ALJ did not discuss pertinent elements of the examining physician's medical opinion, and the ALJ's conclusions suggest that those elements were not considered. It is possible that the ALJ considered and rejected these two medical opinions, but without clearly articulated grounds for such a rejection, we cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence.

*Id.* at 1178-79.

The Commissioner argues that "[a]lthough the ALJ did not specify the weight he accorded this evidence, any error was harmless because Dr. Shea's opinion was consistent with the ALJ's RFC finding" for a range of sedentary work.  Doc. 14 at 4 (citing *Winschel*).  Plaintiff argues that Dr.

Shea's opinion on Plaintiff's abilities is crucial to deciding whether she is disabled, and if credited fully, would preclude full time work. The Commissioner argues that the ALJ *did* credit the opinion of Dr. Shea implicitly by including some of his restrictions for Plaintiff in the RFC. Dr. Shea's opinion that Plaintiff could sit for less than 6 hours was listed in response to a letter from Plaintiff's counsel seeking an update on her condition dated May 18, 2006. R. 234. In a separate form, Dr. Shea opined that Plaintiff could occasionally lift ten pounds; could never climb, kneel, crouch, crawl, or stoop; could occasionally balance; and was limited in her ability to push and pull, reach, handle, and feel. R. 656-58. The Commissioner argues that these limitations by Dr. Shea *are* reflected in the ALJ's finding that Plaintiff can lift ten pounds occasionally and five pounds frequently; can push and pull objects up to ten pounds; can occasionally perform tasks that require balancing or gross manipulation with either hand; and cannot stoop, kneel, crawl, or crouch. R. 831. However, these restrictions do not address the crucial point as raised by Plaintiff – that the ALJ failed to mention Dr. Shea's opinion that Plaintiff can sit for less than six hours in an eight-hour workday, which the ALJ neither included nor discounted in his decision.

In the same time period, June 6, 2006, Dr. Shea completed the SSA's form – Medical Source Statement of Ability To Do Work-Related Activities (Physical). He opined that Plaintiff must periodically alternate sitting and standing to relieve pain or discomfort. R. 657. The form required the physician to "explain in item 5" his answer, which required him to list the "medical/clinical findings [to] support [his] conclusions." R. 657. Dr. Shea wrote: "Moderate sized lumbar disc herniation causes significant back pain which requires frequent changes in position and restricts lifting and bending. Left carpal tunnel syndrome with a left ulnar neuropathy at the elbow restricts use of the left arm for lifting, carrying and pushing and pulling." R. 657.

In support of the argument that the omission is harmless, the Commissioner contends that the limitation of sitting less than six hours in an eight-hour workday would not necessarily prevent Plaintiff from working a full eight-hour workday and necessarily render her disabled because Dr. Shea also opined that Plaintiff could stand and walk for at least two hours a day. R. 656. The Commissioner, without citation to authority, contends that the ALJ's inclusion of a sit-stand option completely rectifies the omission of Dr. Shea's opinion that Plaintiff is unable to sit for six hours per day (R. 831) because if "Plaintiff can stand and walk for more than two hours a day, can sit for less than six hours a day, and can alternate between sitting and standing at will," then Plaintiff cannot "show that she would be unable to complete a normal eight-hour workday or that she would have limitations in addition to those found in her RFC." Doc. 14 at 6 (citing R. 1012-13). The Commissioner argues, therefore, that a remand to have the ALJ assign weight to Dr. Shea's June 2006 opinion-letter would serve no practical purpose and would be a waste of judicial and administrative resources.

The Court notes that although the Commissioner acknowledges the applicability of *Winschel* in a different part of the Memorandum, he cites to a previous Eleventh Circuit case[2] finding a "harmless error" where the ALJ omitted discussion of a treating physician's opinion – which, if not overruled outright, is at the very least no longer entirely consistent with *Winschel*. Pursuant to *Winschel*, where the ALJ fails to discuss "the pertinent elements of the examining physician's medical opinion" the case must be remanded for the ALJ to include it. In this case, Plaintiff's inability to sit

_____

[2]Doc. 14 at 6 (citing *East v. Barnhart*, 197 F.App'x 899, 901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination)). The Commissioner also cites without discussion two cases from other circuits that are inapposite in light of the Eleventh Circuit's *Winschel* decision. *Ware v. Schweiker*, 651 F.2d 408, 412 (5th Cir. 1981); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

for six hours in an eight-hour workday is "a pertinent element" of Dr. Shea's opinion which was not included in Plaintiff's RFC or the defective hypothetical to the VE.

Plaintiff seeks to have her case remanded for an award of disability benefits. The ALJ's omission of Dr. Shea's opinion, in tandem with the failure to credit Dr. Miles' opinion of Plaintiff's condition as described in the next section, leads the Court to recommend reversal and remand for an award of benefits as discussed below.

*2. Dr. Miles*

Plaintiff contends that the ALJ erred in failing to give substantial weight to the opinion of the treating specialist/cardiologist, Dr. Miles, as there was not good cause to disregard the opinion of Dr. Miles, in favor of the opinion of Edwin Bryan, M.D., a non-examining medical expert, regarding Plaintiff's dysautonomic syndrome. The ALJ's decision discounted Dr. Miles' opinion as follows:

> When diagnosing claimant's dysautonomic syndrome, Dr. Miles wrote that it "appears" claimant has dysautonomic syndrome. According to Dr. Bryan, Dr. Miles was attempting to diagnosis [sic] the continued presence of various symptoms when various medical tests indicated she was not as severely impaired as alleged. The undersigned finds Dr. Bryan's opinion that Dr. Miles' diagnosis was not a true diagnosis is correct and in accordance with the objective medical evidence.
>
> The undersigned notes that if a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The undersigned concludes in the present case, however, that the opinion is not well supported by medically acceptable techniques and is inconsistent with the other substantial evidence in the record. As noted in Dr. Bryan's testimony, Dr. Miles was attempting to diagnosis [sic] claimant based on her symptoms when testing indicated she was not impaired. Thus, the clinical and laboratory techniques are inconsistent with Dr. Miles' conclusion.

R. 836.

Plaintiff argues the ALJ's finding that Dr. Miles' conclusions are not consistent with the clinical and laboratory techniques is not supported by substantial evidence because the clinical and

laboratory techniques are consistent and directly support Dr. Miles' conclusion; thus, the ALJ erred in disregarding the opinion of the treating physician, Dr. Miles, which should have been accorded substantial weight.

The Commissioner argues that the ALJ properly discounted the opinion from Dr. Miles and provided sufficient good cause for doing so in his decision. R. 836. The Commissioner argues that Dr. Miles diagnosed only a "possible" dysautonomic syndrome and found that Plaintiff's cardiac exam was normal and her lungs were clear (Doc. 14 citing R. 708, 711), and a diagnosis alone is not enough to show that Plaintiff is disabled. Thus, the Commissioner argues, because Dr. Miles did not opine that Plaintiff had any functional limitations or that she was unable to perform work activities (R. 708-12), she has failed to show how she was prejudiced by the ALJ's evaluation of Dr. Miles' opinion. The Commissioner contends that the ALJ was entitled to rely on the testimony of Dr. Bryan, the medical expert, who testified that in his opinion, there was no "firm evidence" of dysautonomic syndrome. R. 834, 955. Dr. Bryan testified that Plaintiff did not have a severe cardiac impairment because she had good cardiac functioning and no major ongoing arrhythmia, and the Commissioner argues this was evidence in the medical record on which Dr. Bryan was entitled to rely. Doc. 14 (citing R. 834, 956). The Commissioner also cites other evidence of "normal" cardiac results and testing in the medical records that support the ALJ's decision to credit Dr. Bryan's opinion over Dr. Miles, Doc. 14 (citing R. 446-47, 423, 419-20, 909-11, 924-25).

However, this runs contrary to the direction the Court gave regarding Dr. Miles' opinion when Plaintiff's case was remanded in 2009. In the Court's prior Report and Recommendation, Plaintiff's condition was described as dysautonomic syndrome, which is defined as the abnormal functioning of the autonomic nervous system. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

Although this Court read Dr. Miles' notes as having finally diagnosed Plaintiff with the condition of dysautonomic syndrome and ordering evaluation of this impairment on remand, the second ALJ heard started from scratch and took testimony from the non-examining medical expert, Dr. Bryan, a cardiologist, who called into question Dr. Miles' diagnosis contending that it was "not a final diagnosis." The ALJ then relied on Dr. Bryan's testimony in rejecting Dr. Miles' opinion, which was error.

Following many years of other doctors[3] – including cardiologists such as Plaintiff's treating physician Dr. Ahuja – being unable to figure out what was wrong with Plaintiff or effectively treat her symptoms, rather than "order a consultative examination if necessary," as specified in the Court's previous Report recommending remand, the ALJ heard testimony from the non-examining medical expert, Dr. Bryan, a cardiologist, who called into question Dr. Miles' diagnosis contending that it was "not a final diagnosis." For the ALJ to give Dr. Bryan's opinion substantial weight and let it override the opinion of the treating cardiologist/specialist was error and for this reason, the ALJ's decision was not based on substantial evidence.

Dr. Miles was Plaintiff's treating specialist and cardiologist, a Professor in the Department of Medicine, Division of Cardiology, at Shands HealthCare at the University of Florida. He opined that Plaintiff suffered from dysautonomic syndrome. R. 708. The Court previously found that "[t]he ALJ's failure to consider Dr. Shea's opinion in light of the diagnosis by Dr. Miles, and to properly consider Dr. Miles' diagnosis of Plaintiff with a nervous system disorder causing cardiac and other problems, was error." R. 850. The Court previously outlined the difficulty physicians had diagnosing Plaintiff's cardiac and blood pressure problems:

---

[3]Plaintiff was treated by her primary care doctor, an orthopedist, a neurologist, a cardiologist, an allergist, and a pain medicine specialist between 1999 and October 2006 when Dr. Miles finally made the diagnosis of dysautonomic syndrome, after ruling out other cardiac conditions.

Plaintiff was previously diagnosed with postural orthostatic tachycardia syndrome ("POTS"); Dr. Miles noted that Plaintiff had a tilt table test in 2003 that was positive for POTS. R. 710, 713-14 (April 2003). However, at the initial visit, Dr. Miles noted that Plaintiff had an elevated heart rate and blood pressure[4] both chronically and intermittently, which was "suggestive of a dysautonomic syndrome of which the [POTS] is one type." R. 711.

According to the National Institute of Health website, dysautonomia is defined as "a disorder of autonomic nervous system function."[5] The autonomic nervous system controls much of the body's involuntary functions; symptoms of dysautonomia can include problems with the regulation of heart rate, blood pressure, body temperature and perspiration, fatigue, lightheadedness, feeling faint or passing out (syncope), weakness and cognitive impairment[6]. *See Salter v. Astrue*, Case No. 3:08-cv-189-RV-EMT, 2009 WL 1457125, *3-*4 (N.D. Fla. Apr. 1, 2009) (noting Plaintiff's dysautonomia is a dysfunction of the autonomic nervous system which controls heart rhythm, blood pressure, saliva glands, sweat glands, and the stomach; Plaintiff experienced blood pressure drops of 40 to 50 points without warning when she stood up, fainting palpitations, and fatigue), *report and recommendation adopted with modification by* 2009 WL 1457121 (N.D. Fla. May 22, 2009) (reversing and remanding the Commissioner's decision for further analysis).

On October 27, 2006, Dr. Miles had a follow up visit with Plaintiff to discuss her other test results, most of which were normal, and were intended to rule out other conditions. R. 708. However, the heart monitoring over the month-long period using an event recorder led Dr. Miles to believe (R. 708) that Plaintiff did *not* have paroxysmal supraventricular tachycardia as was originally diagnosed – although he could not completely rule it out – but she had a different condition:

> She transmitted 105 events during the period, consisting of fast heartbeat, palpitations, chest discomfort and shortness of breath. There were multiple tracings that showed mild sinus tachycardia. Occasionally the tachycardia was fast enough (about 160-170 per minute) that I cannot completely rule out a paroxysmal supraventricular tachycardia. The event monitor company read several of the tracings as having PVCs, but on careful inspection these are all artifacts, so I do not think that significant ventricular ectopy is present. I should note that the patient had an ablation of AV node reentrant tachycardia in 2002. She had a followup electrophysiology study in 2003, at which time no tachycardia was inducible.

---

[4]Plaintiff brought Dr. Miles multiple blood pressure and heart rate recordings to review. R. 711.

[5]http://www.ninds.nih.gov/disorders/dysautonomia/dysautonomia.htm.

[6]http://www.ndrf.org.

R. 708. Dr. Miles confirmed that Plaintiff had a different impairment, dysautonomic syndrome and he discussed with her "the frustration" of managing the condition. R. 708. Previously, he "talked to her at some length about dysautonomic syndromes which are in the long run very difficult to treat, pharmacologic therapy ultimately not being very satisfying in a lot of patients." R. 713. He explained at the follow up visit on October 27, 2006:

> Impression and plan: The patient appears to have a dysautonomic syndrome. She has had multiple attempts at drug therapy in the past. She has never had Midodrine, but tells me that she is usually hypertensive, and therefore an alpha agonist like Midodrine is probably not going to be of any help. We spent some time talking about dysautonomic syndromes with both the patient and her husband, especially about the frustration related to the syndrome and its management. We talked about recent European data showing that isometric muscle contractions of the upper or lower extremity at the onset of symptoms abort symptoms in some patients. *I am not sure that adding any other medications to her regiment at this time would actually be of any value.* We talked about trying to individualize her Toprol does, with larger doses on bad days and smaller doses on good days. We talked about trying to [do] a little bit of conditioning, but not doing a fad diet, since she is a little concerned about her weight gain. She has multiple symptoms associated on monitor with clear sinus tachycardia and so I do not think the few tracings where sinus cannot be differentiated from the possibility of PSVT are significant enough that we should do another electrophysiology study. However, if she begins to have episodes of very rapid tachycardia in the future we can consider another electrophysiology study to rule out recurrent AV node reentry, which I think is unlikely and clearly does not account for the majority of her symptoms, given the multiple symptomatic transmissions that she has sent over the last month.

R. 709 (emphasis added).

In his decision, the ALJ failed to give any recognition whatsoever to the diagnosis by Dr. Miles, the cardiac specialist from Shands Health Center at the University of Florida. In fact, the ALJ *miscited* Dr. Miles' report as Dr. Ahuja's, and only selected the "normal" or positive health information to quote. While accidently misciting one cardiologist as the author of another's report (especially if they practice together for instance) might arguably not be of much consequence, it is in this case. Dr. Ahuja sent Plaintiff to Dr. Miles, a Professor in the Department of Medicine, Division of Cardiology, at Shands, presumably because Dr. Ahuja needed assistance in evaluating Plaintiff's challenging condition for diagnosis. A review of Dr. Miles' treatment notes indicates that more extensive testing was required before he could diagnose Plaintiff, and even his ultimate diagnosis was not 100% certain because of

the nature of the condition. R. 709. In fact, although Dr. Ahuja's treatment notes are in the file, they end on October 19, 2006, one week before Dr. Miles' treatment notes indicate that he diagnosed Plaintiff's condition, discussed it with her and dictated a letter to Dr. Ahuja explaining the diagnosis. Thus, Dr. Ahuja's notes *do not reflect anywhere* that he received Dr. Miles' ultimate diagnosis that Plaintiff actually had dysautonomic syndrome – affecting the nervous system – and most likely *not* supraventricular tachycardia – affecting primarily the heart. *Compare* R. 681 with R. 709.

 R. 850-52 (internal citations omitted).

The Court previously criticized the original ALJ's decision which "pulled selected information from Dr. Miles' report and ignored other crucial information, such Dr. Miles' opinion that treatment could be 'frustrating' or questioning, whether in his opinion, adding *any* medication to Plaintiff's regimen would even be 'of any value.'" R. 852 (citing R. 709). The original ALJ cited language from Dr. Miles' report (as Dr. Ahuja's) indicating many of Plaintiff's test results were normal and ruled out certain cardiac conditions; however, Dr. Miles expected these tests to be normal since they were administered to rule out certain causes of Plaintiff's condition or to narrow it down to the condition he suspected, dysautonomic syndrome. R.853 (citing R. 713). The first ALJ implied that Plaintiff's cardiac condition was either normal or mild and ignored Dr. Miles' report. R. 853.

The Court held that "[b]ecause the ALJ did not recognize Dr. Miles' report and his ultimate diagnosis, failing to distinguish the two cardiologists – and failing to even mention Dr. Miles' diagnosis of dysautonomic syndrome – his decision was not based on substantial evidence." R. 854. The Court also noted that the original ALJ had erroneously relied on the testimony of the medical expert from the first hearing that Plaintiff's "heart was very strong and functioning as one would expect from a 29-year old" (R. 59), based solely on the single cardiolite stress test run by Dr. Ahuja, which had normal results. R. 854 (citing R. 57). The ME from the first hearing failed to recognize that Dr. Miles had diagnosed Plaintiff's cardiac problems as caused by dysautonomic syndrome. R

854 (citing R. 744). The Court found that because the ALJ relied on the ME's testimony which failed to recognize Dr. Miles' report and his ultimate diagnosis, the first ALJ's decision was not based on substantial evidence. R. 854.

With this analysis as set forth in the Court's analysis in Plaintiff's previous appeal then, it is quite surprising to the Court that on remand the second ALJ would make similar errors revisiting Plaintiff's "normal" cardiac results as evidence that she has no cardiac or nervous system impairment at all. As the Court explained previously, Plaintiff was sent to see Dr. Miles precisely because she had "normal" cardiac testing with Dr. Ahuja, despite other testing showing she had symptoms of other conditions: problems with the regulation of heart rate, blood pressure, including supraventricular tachycardia, postural orthostatic tachycardia syndrome (POTS) shown in a tilt table test in 2003, pain, syncope, irritable bowel syndrome, and chronic fatigue syndrome, with symptoms of extreme weakness, sore joints, and stabbing pains, trigger points over multiple areas of the shoulders and back suggestive of fibromyalgia. R. 278, 493, 710, 713-14, 781-82. It is no surprise then that her condition was extremely difficult to diagnose; dysautonomic syndrome is often misdiagnosed as chronic fatigue syndrome, fibromyalgia, POTS, irritable bowel syndrome, or neurocariogenic syncope.[7]

Against this backdrop, the second ALJ heard testimony from another cardiac specialist (retired) medical expert at the hearing and – not surprisingly – he has looked over the records and determined that Plaintiff has many "normal" cardiac test results. On this basis, he rejects Dr. Miles'

---

[7]One informational medical website summed it up as:
The severity of the symptoms in people with dysautonomia are typically far out of proportion to any objective physical or laboratory findings (especially when the doctors don't know which findings to look for) . . . . Patients lucky enough to be taken seriously by their family doctors are likely to be referred to a specialist. The type of specialist they are sent to usually depends on the predominant symptom they are experiencing, or on the symptom that most impresses the family doctor. And the diagnosis they are ultimately given depends on their predominant symptoms and which specialist they end up seeing. Thus: Those whose main complaint is easy fatigability are likely to be diagnosed with [chronic fatigue syndrome]. Those who pass out are labeled as vasovagal or neurocardiogenic syncope. . . . If dizziness on standing up is the chief problem, POTS is the diagnosis. Diarrhea or abdominal pain buys you irritable bowel syndrome. Pain elsewhere ends up being fibromyalgia. Richard N. Fogoros, http://heartdisease.about.com/cs/womensissues/a/dysautonomia htm.

opinion as "not a precise diagnosis" and "only a speculation." R. 954. Dr. Bryan testified about Dr. Miles' diagnosis:

> They're postulating an abnormality of the autonomic nervous system. The autonomic nervous system is that system in the body that kind of controls may things, the vasculature, the heart rate, etc., and they're assuming – they're thinking it may be her autonomic nervous system is out of kilter which has caused her to have a tendency to have the sinus tachycardia, which is a little bit higher rate of her heart rate than normal, but really I do not have a precise diagnosis of that, and to say that's only a speculation. They're just trying to explain her symptoms which include apparently times, multiple times of syncope and passing out, and these things which they really cannot document on any other basis.

R. 954. The ALJ asks, "You don't agree with that conclusion?" R. 954. To which the ME responds:

> I don't disagree. They're hunting for an explanation of her tendency to have sinus tachycardia, but the terms that she appears to have, is not – is a whole lot different from saying that she actually does have it, and we can prove it. So I think that they're saying . . . they're just hunting for an explanation for some of her symptoms.

R. 954. The ALJ asks, "[I]s there medical evidence to show she has dysautonomic syndrome?" R. 955. The ME opined:

> I don't think there's firm evidence, no. I think that's a possibility for some of her symptoms. That's one of those syndromes that you have a very hard time proving by any other – any specific thing other than the – your physical examination findings, etc.
>
> * * *
>
> I think she's so polysymptomatic that it's very hard to pin down an impairment; at least an impairment as defined by the Secretary. She clearly has some psychological/psychiatric issues. . . . She's just polysymptomatic with irritable bowel syndrome, migraines, weakness, . . . all of these I think are really not very well explained, and certainly are not going to be cured by additional doctors and additional testing and additional medication.
>
> * * *
>
> Well I don't think she has a severe cardiac impairment. I find no evidence of a severe tachycardiac impairment at this time. She may well have had one prior to the ablation . . . but her cardiac situation right now is that she's got controlled hypertension. She has a very good cardiac function . . . by stress cardio [lite] testing, injection fraction in the 60 to 70 range. And she has not been demonstrated to have any ongoing major

arrhythmias so I do not find evidence of severe cardiac impairment. . . .I don't think that you're going to find severe impairment in the cardiac arena.

\* \* \*

I found this record quite confusing as I went through it. . . . I would not limit her on the basis of cardiac.

\* \* \*

[Dr. Miles] found sinus tachycardia on the one month event monitor. In other words, when he saw her in September 2006, he was seeing her to evaluate her symptoms of palpitation and hypertension. He found her. . . heart rhythms were fine when he saw her. He ordered the event monitor, and then he reports on that event monitor in October. . . . That's when he saw that the event monitor . . . She had symptoms [of] sinus tachycardia. She was not having any major arrhythmias. . . . The doctor sent him the result of the tilt test.

R. 955-60. When the ME was asked by Plaintiff's counsel how the ME would determine whether a patient is suffering from dysautonomic syndrome, he responded:

[T]hat's a conclusion that you reach based upon their symptoms. Finding that they have inappropriate sinus tachycardia, perhaps finding that they have inappropriate sweating, they have other inappropriate diarrheas, any other evidence of malfunctions of the autonomic nervous system. It becomes more or less a diagnosis of putting that label to the symptoms that you see with the patient.

\* \* \*

I did not see inappropriate sweating [but] she did have irritable bowel syndrome, diarrheas in some of the earlier records. Those are some of the considerations that Dr. Miles had when he, he raised that question.

R. 961.

As one of six factors, the ALJ is directed to weigh the medical opinion of the treating physician based on the "specialization in the medical issues at issue." 20 C.F.R. § 404.1527(d). In this case, Dr. Ahuja, Plaintiff's treating cardiologist referred her to Dr. Miles, a Professor in the Department of Medicine, Division of Cardiology, at Shands Health Center at the University of Florida, presumably because Dr. Ahuja needed assistance in evaluating Plaintiff's difficult to diagnose

condition.  Dr. Miles' opinion of Plaintiff's condition, as a treating physician's opinion, is generally entitled to more weight than a consulting physician's opinion and a non-examining physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).  The ALJ rejected Dr. Miles' opinion based on the opinion of the non-examining ME who conceded that Plaintiff had some of the symptoms supporting the diagnosis of dysautonomic syndrome, even if not all symptoms (unusual sweating).  Particularly in the case of a condition that is as difficult to diagnose as dysautonomic syndrome, it was error for the second ALJ to rely on the opinion of the ME who looked at the paper record and, finding the "normal" cardiac results that had caused Dr. Ahuja to refer Plaintiff to Dr. Miles in the first place and discount the diagnosis of dysautonomic syndrome.

### B.  Remand for benefits

In rare instances does the Court remand a case for an award of benefits.  The Court is very troubled by the length of time this case has been in consideration by the Commissioner – almost a decade.  Plaintiff applied for benefits in 2002, alleging the onset of disability in 1999.  Nearly thirteen years have now passed since the time Plaintiff alleges that she first became unable to work due to her impairments; nearly a decade has passed since she first applied for benefits.  Plaintiff's case was remanded once already for the ALJ to further consider Plaintiff's limitations based on the diagnosis of dysautonomic syndrome from Dr. Miles.  Instead of determining Plaintiff's RFC based on this condition through a request to Dr. Miles, Dr. Ahuja, or a consultative examiner, the ALJ chose to call a non-examining ME at the hearing to contradict Dr. Miles' diagnosis based on the "normal" cardiac tests that had stumped Dr. Ahuja before he sent Plaintiff to be treated by Dr. Miles.  This error and delay are significant.

In a number of other lengthy-delay cases, courts have determined that equitable considerations outweighed the need for further administrative adjudication, whether because of the futility of further administrative proceedings with repeated remands, the failure of the agency to follow the court's remand instructions, the Commissioner's failure to carry his burden of proof, the existence of extraordinary delay, or a combination of these factors. 2 Barbara Samuels, SOCIAL SECURITY DISABILITY CLAIMS: PRACTICE AND PROCEDURE § 19:59 (2d ed 2008); *McClain v. Barnhart*, 299 F. Supp. 2d 309 (S.D. N.Y. 2004) (in light of the nine year adjudicatory delay in case, claim would be remanded for calculation of benefits where the record contained compelling evidence of claimant's disability and where the Commissioner had twice failed to marshal substantial evidence to support his finding to the contrary); *Huhta v. Barnhart*, 328 F. Supp. 2d 377 (W.D. N.Y. 2004) (remand solely for calculation of benefits was warranted where Commissioner failed to show that claimant could perform other work and nine years had elapsed since claimant filed his first application).

In *Frazee v. Barnhart*, the district court ordered a remand with benefits where "in typical circumstances, the court would remand this case for further analysis of the effect of plaintiff's IQ scores on his RFC and his ability to perform work in the national economy" but the "ALJ has had two chances to conduct a proper determination" and had failed to do so in a case that had been pending almost ten years. 259 F. Supp.2d 1182, 1202-03 (D. Kan. 2003) (citing, *e.g.*, *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998) (after eight years, time "to bring the charade to an end") and *Sisco v. United States Dep't of HHS*, 10 F.3d 739, 746 (10th Cir. 1993) (remanding for award of benefits; Social Security Administration not entitled to adjudicate case *ad infinitum* until it correctly applies the proper legal standard and gathers evidence to support its conclusion)); *see Epling v. Commissioner of Social Security*, 2009 WL 635788, 30 (M.D. Fla. 2009) (remanding for benefits based on the twenty-two year history of the case and prior remands with analysis that had not been followed,

finding a remand for a new credibility determination "would be inequitable and unjust" to the plaintiff); *see  Geiger v. Apfel*, Case No. 6:99-cv-12-Orl-18D, 2000 WL 381920 (M.D. Fla. Feb. 9, 2000).

Although the proper remedy for errors is generally not an award of benefits, but rather a remand for further proceedings, the Commissioner does not receive "endless opportunities to get it right." *Seavey v. Barnhart*, 276 F.3d 1, 13 (1st Cir. 2001) (citing *Miller v. Chater*, 99 F.3d 972, 978 (10th Cir. 1996). "Some circuit courts have exercised . . . a form of equitable power to order benefits in cases where the entitlement is not totally clear, but the delay involved in repeated remands has become unconscionable." *Seavey*, 276 F.3d at 13 (citing *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (remanding for payment of benefits in light of "substantial evidence" of a severe mental disability and "considerable inexplicable delays" resulting in passage of ten years since application)).

In *Wilder v. Apfel*, the Seventh Circuit ordered a remand for benefits where the court found the ALJ had ignored the appellate court's prior discussion of the evidence and rejected it, and the Commissioner had argued against the court's previous analysis of the medical evidence as "dicta." 153 F.3d 799, 803-04 (7th Cir. 1998).   "Given the obduracy evidenced by the action of the administrative agency on remand, we remand the case to the agency with directions that the application for benefits be granted" in order "to bring the charade to an end." *Id.* at 801, 804.

In *Rohan v. Barnhart,* over the course of eleven years, the plaintiff had three hearings before an ALJ, three petitions to the Appeals Council, three appeals to the district court, two concessions by the Commissioner that ALJ decisions were inadequate, and one appeal to the court of appeals.  306 F.Supp.2d 756, 770-71 (N.D. Ill. 2004).  The delays in the case were caused by "deficiencies that were not attributable to plaintiff's error" and a remand would have required the case to go to a third ALJ, which would have delayed the case for yet another year or more because the ALJ would have to

review the 655 page record and possibly conduct a new hearing in order to make credibility determinations. *Id.* The court found "such delay unconscionable"– "Plaintiff need not 'wait with the patience of Job for yet another remand.'" *Id.* (quoting *Smith v. Califano*, 637 F.2d 968, 973 n. 1 (3d Cir. 1981)). "'Where further administrative proceedings would simply prolong [plaintiff's] waiting and delay his ultimate receipt of benefits, reversal is especially appropriate.'" *Id.* (quoting *Podedworny v. Harris*, 745 F.2d 210, 223 (3d Cir.1984)).

In this case, Plaintiff has a difficult to diagnose condition; she has some but not all symptoms of that condition, and it took her physicians some time to figure out what her impairments were. However, on remand, rather than determine Plaintiff's limitations from dysautonomic syndrome by contacting Dr. Miles or a consultative examiner, the ALJ found that Plaintiff did *not* have dysautonomic syndrome. Yet another remand would require the case to go back to an ALJ for a *third time* and cause further delay. The **ten-year** delay Plaintiff has experienced thus far is "unconscionable." As the court said in *Rohan,* "Plaintiff need not 'wait with the patience of Job for yet another remand." 306 F.Supp.2d at 71. Further administrative proceedings at this point will simply prolong her waiting and delay the ultimate receipt of benefits[8].

For the reasons stated above, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED** pursuant to sentence four of 42 U.S.C. § 405 (g), and **REMANDED** for calculation of benefits to Plaintiff as of her initial diagnosis and cardiac treatment in the positive POTS test on April 29, 2003. R. 713-14.

---

[8]Given the Court's recommendation to remand for an award of benefits, the Court need not reach Plaintiff's contention that the ALJ erred in (1) not stating the weight he accorded to the letter by Plaintiff's daughter; (2) not including blackouts in the hypothetical to the VE and (3) in excluding the side effects of her medications as additional limitations, the Court need not address these issues.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on February 7, 2012.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE


Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy